452 F.2d 1154
 CARGILL, INCORPORATED, et al., Petitioners,
v.
Clifford M. HARDIN, Secretary of Agriculture, Thomas J.
Flavin, Judicial Officer by Appointment of the
Secretary of Agriculture, and the United
States Department of
Agriculture, Respondents.
 No. 20597.
 United States Court of Appeals,
Eighth Circuit.
 Dec. 7, 1971.
 
 Calvin J. Anderson, Gen. Counsel, Cargill, Inc., Minneapolis, Minn., for Cargill, Inc.
 Dorsey, Marquart, Windhorst, West & Halladay by Peter Dorsey, and James H. O'Hagan, Minneapolis, Minn., for all petitioners.
 Ronald R. Glancz, Atty., L. Patrick Gray, III, Asst. Atty. Gen., Walter H. Fleischer, Atty., Dept. of Justice, Washington, D. C., for respondents.
 Before JOHNSEN, Senior Circuit Judge, and GIBSON and LAY, Circuit Judges.
 GIBSON, Circuit Judge.
 
 
 1
 This is a petition to set aside an order of the Secretary of Agriculture entered August 13, 1970, finding that the petitioners, Cargill, Inc., and four of its officers (hereafter collectively referred to as Cargill) had manipulated the market price of May 1963 wheat futures[1] on the Chicago Board of Trade in violation of the Commodity Exchange Act, 7 U.S.C. Secs. 9 and 13. Proposed sanctions were suspended because of the undue protraction of the proceedings, not due to any fault of the petitioners, and because of their apparent reliance on the case of Volkart Bros., Inc. v. Freeman, 311 F.2d 52 (5th Cir. 1962), as legitimating the conduct in question.
 
 
 2
 I. THE NATURE OF A COMMODITIES FUTURE MARKET
 
 
 3
 In order to understand the nature of this case, a brief description of the operation of a commodity futures market is necessary. Trading in commodities futures is regulated by the Secretary of Agriculture pursuant to the provisions of the Commodities Exchange Act, 7 U.S.C. Sec. 1 et seq., and must be conducted only on a designated contract market in accordance with the market rules. The Chicago Board of Trade is a designated contract market, and the parties are in basic agreement with the following description of wheat futures trading on the Chicago Board of Trade during the times in question.
 
 
 4
 Chicago is the major futures market for wheat, particularly soft red winter wheat. A wheat futures contract on the Chicago Board of Trade is a contract made on or subject to the rules of the Board of Trade, in which one party agrees to sell and deliver and the other party agrees to buy and receive a specified quantity of wheat at a specified price in a designated month in the future. The normal trading unit is one contract consisting of 5000 bushels. The parties determine the price, the number of contracts or quantity of wheat, and the month of delivery. All other items and conditions of the contract are fixed by the rules of the Board of Trade and are incorporated into every contract. When the proper deposits are made, the clearing organization of the Board of Trade is substituted as buyer from the seller and as seller to the buyer and thereafter each of the contracting parties is obligated only to the clearing organization.
 
 
 5
 A wheat futures contract must be satisfied or liquidated by (1) an opposite and offsetting transaction in the same future prior to the expiration of trading in that future, or by (2) delivery of the specified quantity of wheat by the seller and its receipt and payment by the buyer during the specified delivery month and in conformity with the rules of the Board of Trade.[2] A trader who fails to satisfy one or the other of these conditions is in default on his contract.
 
 
 6
 A trader who has bought futures and is therefore obligated to take delivery or make an offsetting sale has an open long position and is referred to as a "long," and a trader who has sold futures and is obligated to deliver or make an offsetting purchase is a "short" and has an open short position. The maximum net long or net short speculative position in any wheat future which any one person may hold or control on any one contract market is 2,000,000 bushels.
 
 
 7
 The crop year for wheat in the United States is from approximately June 1 to May 31 of the following year. At all times material herein the delivery months in which wheat futures could be traded on the Chicago Board of Trade were July, September, December, March and May. The May 1963 wheat future was the last future for the 1962-1963 crop year (old crop), and the July 1963 wheat future was the first future for the 1963-1964 crop year (new crop). June 1, 1962, was the first day for trading in the May 1963 future and May 21, 1963 (Tuesday) was the last day. During the remaining seven business days in May, deliveries of wheat in satisfaction of May 1963 futures contracts could be made. May 31, 1963 (Friday) was the last day for delivery of wheat in satisfaction of a May 1963 futures contract. Any May 1963 futures contract open thereafter was in default.
 
 
 8
 Approximately 99 per cent of futures contracts on the Chicago Board of Trade are offset by an opposite transaction or transactions. When a futures contract is satisfied by delivery, the delivery is effectuated by tender on the part of the seller and acceptance on the part of the buyer of a warehouse receipt or receipts covering a specified quantity of deliverable grade wheat stored in a designated warehouse in the Chicago area approved by the Chicago Board of Trade as regular for delivery. There are no delivery points outside of the Chicago area. Under the rules of the Board of Trade, during the last three business days of a delivery month delivery may also be made by tendering deliverable grade wheat loaded in railroad cars on track in the Chicago switching district, which cars are consigned to an approved Chicago warehouse or elevator.
 
 
 9
 Soft red winter wheat is one of various classes of wheat produced in the United States, and Chicago is one of the principal markets for such wheat. The Chicago wheat futures contract is essentially a soft red winter wheat contract because No. 2 soft red winter wheat is the cheapest grade and class deliverable at par in satisfaction of the contract, and therefore the price of the Chicago wheat future tends generally to reflect the value of No. 2 soft red winter wheat.
 
 
 10
 If the futures market is functioning properly, at the close of trading in the future, the price of the future will correspond closely to the price of the cash wheat which will satisfy delivery. Thus, if in the interim between the making of the futures contract and the close of trading in the future, the price of wheat declines (which decline will be reflected in the decline of the price of the future), then the short will have made a profit on his contract, because he can either buy the wheat at the lower price in the cash market and deliver it for the higher price in his futures contract, or he can offset his short contract in the futures market by buying futures at the lower price. Conversely, if the price of wheat rises, (which will cause the price of the future to rise), the long will have made a profit on his contract, because he can take delivery of the cash wheat at the lower price in his futures contract and sell it at the higher market prices, or he can offset his long contract in the futures market by selling at the higher price.
 
 
 11
 As the Chicago Board of Trade points out in its amicus curiae brief in this case, futures trading in commodities performs several economic functions. The seasonal nature of crop production created the necessity for a mechanism whereby farmers could spread the sale of their crops over many months. Futures contracts, which allow the agricultural producer to sell his crop for delivery in a future month helps to eliminate the fluctuation of crop prices which results from the imbalance of supply over demand at the end of a harvesting period.
 
 
 12
 In addition, futures trading in commodities on a large, well-organized exchange provides reliable pricing information for persons and firms throughout the world who buy and sell the commodity on the cash market for consumption, processing or resale. Price quotations for commodities traded on the Board of Trade for future delivery are disseminated around the world and are used by those who trade in the cash commodity as guidelines in their pricing of the commodities.
 
 
 13
 Finally, since a futures contract permits the immediate fixing of the price of a transaction that will not be consummated until a future date, futures trading performs an "insurance" function. For the seller of agricultural products confronted with the risk of price decline prior to sale, and for the buyer of those products confronted with the risk of price increase prior to purchase, the futures market offers a form of "price insurance" which guarantees the futures price agreed to even if market prices subsequently rise or fall prior to the date of delivery. Persons utilizing the futures market as protection from the risk of adverse price fluctuations are commonly called "hedgers", and the use of futures contracts for this purpose is called "hedging." A grain merchant will usually sell short or hedge its stock of cash wheat in a futures market. The hedge acts as an insurance against drastic drops in the price of wheat. Processors of wheat will normally hedge their mill commitments by buying long futures. The long futures act as insurance against a rapid rise in the price and can be utilized as a source of supply for the processors. In general, hedging transfers the risk of price changes to the holders of futures.
 
 
 14
 The avoidance of this risk by "hedgers" necessarily means that other persons must be willing to take that risk. These other persons, commonly called "speculators," invest in commodity futures contracts for capital appreciation. Speculation supplies needed risk capital, increases the volume of trade to allow easy market entry and egress, and keeps the various markets in alignment through intermarket training operations.
 
 
 15
 In order for the futures market to perform its functions effectively, prices must reflect as nearly as possible market factors of supply and demand. Manipulation of prices by means not reflecting basic supply and demand factors creates conditions which prevent the futures market from performing its basic economic function and hence diminishes its utility to those members of the trade and general public who rely on its basic purposes. For this reason, price manipulation is forbidden by the Commodity Exchange Act, 7 U.S.C. Secs. 9 and 13. It is price manipulation with which Cargill is charged in this proceeding.
 
 
 16
 II. CARGILL'S ACTIVITIES IN THE MAY 1963 CHICAGO WHEAT FUTURES MARKET
 
 
 17
 Cargill, Inc., is a closely held family corporation and is one of the largest grain merchandisers and exporters in the country. It owns an elevator and warehouse in Chicago which is designated regular for delivery of grain on the Chicago Board of Trade. In early 1963, Cargill was of the opinion that there would be an ample supply of soft red winter wheat at the end of the crop year, May 1963, and hence hedged its inventory by selling May 1963 wheat futures on the Chicago Board of Trade. In early March 1963 it reached a maximum short position in the future of more than eight million bushels.[3] As explained above, such a hedge operates as "insurance" against falling prices.
 
 
 18
 However, in February and March of 1963, Cargill sold substantial quantities of soft red winter wheat to mills in the Southwestern part of the United States. This demand was unusual because ordinarily soft red winter wheat does not move from Chicago to the Southwest. Apparently the movement was prompted by an unusual combination of freight rates which made it economical to ship wheat in this direction. Also in March, the Spanish Government indicated a definite interest in purchasing large quantities of soft red winter wheat and Cargill hoped that it would be able to obtain some of this business. Based upon these developments, Cargill revised its opinion of the supply-demand situation and concluded that supplies of wheat would be tight by May, the end of the crop year, that therefore prices would not fall, but might rise, and began liquidating its short hedges and established a long position in March 1963 Chicago futures.
 
 
 19
 On April 15, 1963, Cargill liquidated all of its short hedges remaining in the May future and established a long speculative position of 250,000 bushels.[4] Between that date and May 15, Cargill increased its speculative long position to 1,930,000 bushels.
 
 
 20
 The United States Department of Agriculture publishes figures every week indicating the quantities of deliverable grade wheat located at various market areas around the country; these figures do not indicate the ownership of such supplies. On April 12, 1963, just prior to the date Cargill established its long position in the May 1963 wheat future, Department figures showed that there were 2,804,000 bushels of deliverable grade wheat stored in Chicago warehouses. Of this amount, Cargill owned 2,471,000 bushels. It is important to note here that Cargill was thus in possession of a vital piece of information that other traders and grain dealers in Chicago did not have access to, namely that it owned the bulk of deliverable wheat in Chicago. While all traders of course knew the total quantity of deliverable wheat available in Chicago, only Cargill was in a position to know that it owned the vast majority of this wheat.
 
 
 21
 In early May 1963 it became known that the Spanish Government would in fact purchase large quantities of wheat; and on Saturday, May 11, it offered to purchase 50,000 tons (40 bushels to the ton) of soft red winter wheat to be delivered by June 10. At this point in time, no American exporter could make this sale because the Department of Agriculture subsidy cutoff date for export of old crop wheat was May 31, and logistical considerations prevented the loading and shipping of the wheat in time to meet the subsidy deadline.[5] Cargill so informed the Department of Agriculture. On Monday, May 13, the Department of Agriculture announced that the subsidy deadline had been extended to June 10, 1963.
 
 
 22
 On Tuesday, May 14, 1963, Cargill offered to sell to Spain 12,500 tons of wheat at a price which equaled $2.13 1/2 per bushel or 10 1/2 cents over the May future; and on the next day, Cargill offered 15,000 tons at a price which equaled $2.09 per bushel or 5 1/2 cents over the May future. Both of these offers were accepted on Saturday, May 18. Cargill thereupon loaded out 770,000 bushels of wheat from its Chicago elevator and shipped it to Spain. Cargill made a profit on both of these Spanish sales.
 
 
 23
 This loadout together with other commitments left Cargill with approximately 50,000 bushels of wheat in its warehouse as of Monday afternoon, May 20. This constituted all of the wheat in Chicago warehouses which was available for delivery on the May wheat future.[6]
 
 
 24
 Monday, May 20, and Tuesday, May 21, were the last two days in which the May 1963 wheat future could be traded on the Chicago Board of Trade, and Cargill decided that it was time to begin liquidating its long futures position. Under Board of Trade rules, the maximum permissible price fluctuation of wheat futures is 10 cents above or below the previous day's closing price. The maximum permissible high price Monday was $2.19 3/8. Cargill placed an order with its broker to sell 100,000 bushels of futures at $2.19. The broker was able to sell only 40,000 bushels at this price and the order was canceled. The market closed that day at $2.18 5/8, an increase of 9 3/4 cents from the previous day's closing price.
 
 
 25
 At the opening of business on May 21, 1963, there was a total open interest in the May 1963 wheat future of approximately 8 million bushels. Of this, Cargill owned 1,890,000 bushels or about 24 per cent. At the same time the quantity of deliverable wheat in Chicago warehouses owned by persons other than Cargill was approximately 20,000 bushels. When trading opened at 9:30 a. m., the future traded at approximately $2.22 and gradually declined until at 11:02 a. m. it traded at $2.15 1/4 which was the low price for the day. During this period, Cargill purchased another 100,000 bushels of futures which increased its speculative long position to 1,990,000 bushels. Additionally, Cargill obtained control of another 50,000 bushels which it agreed to sell for Continental Grain Company's account. Trading in the future was to cease at 12:00 p. m.
 
 
 26
 At 11:45 the future was trading at $2.20. At this point Cargill transmitted to its broker six orders to sell its futures position as follows:
 
 
 27
 200,000 bushels at $2.27
200,000 bushels at $2.27 1/4
300,000 bushels at $2.27 1/2
400,000 bushels at $2.27 3/4
500,000 bushels at $2.28
390,000 bushels at $2.28 1/4
 
 
 28
 These orders were limit orders, which meant that the sales could not be made below the prices specified. The maximum price at which the May 1963 future could be sold was $2.28 5/8.
 
 
 29
 Prices did not reach the limits specified in Cargill's order until 11:53 a. m. At this time Cargill's holdings constituted approximately 62 per cent of the open interest. From this time until the close of trading, Cargill's broker liquidated 1,625,000 bushels for Cargill's account. Prices reached $2.28 5/8, the limit for the day. Confusion and congestion was so great at the close of trading that 420,000 bushels remained open after trading ended, and Cargill had unliquidated holdings of 365,000 bushels.
 
 
 30
 Shortly after the close of trading, Cargill was visited by the Acting Chairman of the Business Conduct Committee of the Chicago Board of Trade, who requested Cargill's cooperation in the orderly liquidation of its remaining long position, pointed out the apparent short supply of soft red winter wheat in the Chicago area and suggested that Cargill offer to sell warehouse receipts to the unresolved shorts in order to clear up the May wheat future. Cargill replied that it only had approximately 35,000 bushels of uncommitted wheat available for sale, but that it could make substantially greater amounts of warehouse receipts available at a price of $2.28 1/4 if it could be assured of receiving these receipts back in settlement of its long position, since this wheat was actually needed for delivery on prior commitments. There were at this time no other warehouse receipts available in Chicago for delivery on the May wheat future. Cargill was advised by the Chicago Board of Trade that it would receive its receipts back in the course of delivery.
 
 
 31
 Cargill thereupon sold 100,000 bushels of warehouse receipts to various commission houses for $2.28 1/4 per bushel. (Approximately 75,000 bushels of this wheat was already committed under prior sales.) These receipts were then tendered to Cargill in satisfaction of the shorts' delivery obligations, resold by Cargill and then redelivered to Cargill and other longs in satisfaction of the contracts, and this process was continued until 370,000 bushels of the unresolved open interest were liquidated by this method. In the course of this circulation, 55,000 bushels of Cargill warehouse receipts were received by longs other than Cargill, who then sold these receipts to other unresolved shorts, who in turn redelivered them to Cargill. Cargill liquidated 315,000 bushels of its long futures by this method, and in addition received 50,000 bushels of wheat from other sources.
 
 
 32
 To summarize then the liquidation of the 420,000 bushels open interest remaining after the close of trading in the May 1963 wheat future, Cargill received 315,000 bushels of its own warehouse receipts plus 50,000 bushels of wheat from other sources, while other longs received 55,000 bushels of Cargill warehouse receipts. All of the Cargill receipts used in this delivery process were sold by Cargill at a price of $2.28 1/4 per bushel.
 
 
 33
 After settlement of the outstanding May futures contracts, Cargill had approximately 88,000 bushels of old crop wheat remaining in its warehouse. Between June 4 and June 13, it disposed of this wheat at prices ranging from $2.10 to $2.13 per bushel.
 
 III. THE GOVERNMENT'S THEORY OF THE CASE
 
 34
 The above statement of the case represents essentially uncontested facts. Issues of fact and law which remain in the case are vigorously contested by the parties. In order to understand the basis of this dispute, it will be helpful to first outline the basic theory of the Government's case that Cargill manipulated the price of the May 1963 wheat futures.
 
 
 35
 The Government's theory of this case is that Cargill manipulated the price of the May 1963 wheat future by means of a device known as a "little corner" or "squeeze."[7] For purposes of clarity in the discussion, we shall use the term "squeeze" exclusively. The Government contends that the squeeze is a "wellknown manipulative device" and is a type of manipulation prohibited by the Commodity Exchange Act.
 
 
 36
 Although a squeeze is defined in slightly varying fashion by different authorities, the essential elements seem to be commonly recognized. A good starting point for a definition is that given by Senator Pope when he was in charge of the bill which was enacted as the Commodity Exchange Act:
 
 
 37
 "Squeeze (congestion): These are terms used to designate a condition in maturing futures where sellers (hedgers or speculators), having waited too long to close their trades, find there are no new sellers from whom they can buy, deliverable stocks are low, and it is too late to procure the actual commodity elsewhere to settle by delivery. Under such circumstances and though the market is not cornered in the ordinary sense, traders who are long hold out for an arbitrary price." 80 Cong.Rec. 8089.
 
 
 38
 This legislative history suggests that indeed squeezes were intended to be prohibited where they were intentionally manipulated. As Senator Pope's definition suggests, a squeeze is to be distinguished from a corner and differs from it in certain respects. In its most extreme form, a corner amounts to nearly a monopoly of a cash commodity, coupled with the ownership of long futures contracts in excess of the amount of that commodity, so that shorts-who because of the monopoly cannot obtain the cash commodity to deliver on their contracts -are forced to offset their contract with the long at a price which he dictates, which of course is as high as he can prudently make it.[8]
 
 
 39
 A squeeze is a less extreme situation than a corner. In this case, there may not be an actual monopoly of the cash commodity itself, but for one reason or another deliverable supplies of the commodity in the delivery month are low, while the open interest on the futures market is considerably in excess of the deliverable supplies. Hence, as a practical matter, most of the shorts cannot satisfy their contracts by delivery of the commodity, and therefore must bid against each other and force the price of the future up in order to offset their contracts. Many squeezes do not involve intentional manipulation of futures prices, but are caused by various natural market forces, such as unusual weather conditions which have caused abnormally low crop production or inadvertent destruction of a substantial volume of the commodity itself. However, given a shortage of deliverable supplies for whatever reason, the futures price can be manipulated by an intentional squeeze where a long acquires contracts substantially in excess of the deliverable supply and so dominates the futures market-i. e. has substantial control of the major portion of the contracts-that he can force the shorts to pay his dictated and artificially high prices in order to settle their contracts.
 
 
 40
 The Government contends that Cargill manipulated the market price of the May 1963 wheat futures by means of a squeeze: (1) Cargill acquired and held a controlling long position in the May 1963 wheat futures; (2) there was an insufficient supply of wheat available to the shorts for delivery on the futures, and what supply there was was controlled by Cargill; (3) Cargill exacted an artificially high price in liquidation of its futures contracts; and (4) the squeeze was intentionally caused by Cargill.
 
 
 41
 Cargill, on the other hand, vigorously contests the factual bases which underly each of the above contentions, and in addition offers two defenses which counter the basic theory of the Government. First, it contends that in order to be guilty of manipulation under the Act, a trader must commit an "uneconomic act", and secondly, and more fundamentally it contends that squeezes are not a form of manipulation prohibited by the Act. We will deal with this latter contention after we have examined the Government's case for the proposition that Cargill in fact accomplished a squeeze.
 
 
 42
 While Cargill has not specifically defined what it means by an "uneconomic act", the apparent implication of its argument is an act which does not make a profit for the party involved. Since it is conceded that all of the acts done by Cargill in the instant case resulted in a profit to the company, it therefore follows from this definition that it has not been guilty of manipulation. This is a rather novel proposition, and we suspect many market traders might be startled to learn that the only manipulators among them are those who failed to make a profit on all of their various maneuvers. Cargill admits there is no case authority for this proposition and suggests it is because it has not been urged before a court in prior cases. It has now been urged and we reject it.
 
 
 43
 The Commodity Exchange Act itself does not define "manipulation", and definitions from other sources are of a most general nature. One of the few judicial definitions is to be found in General Foods Corporation v. Brannan, 170 F.2d 220, 231 (7th Cir. 1948), where the court said:
 
 
 44
 "We are favored with numerous definitions of the word 'manipulation.' Perhaps as good as any is one of the definitions which appears in the government's brief, wherein it is defined as 'the creation of an artificial price by planned action, whether by one man or a group of men."'
 
 
 45
 In the antitrust context, the Supreme Court has said:
 
 
 46
 "* * * [M]arket manipulation in its various manifestations is implicitly an artificial stimulus applied to (or at times a brake on) market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940).
 
 
 47
 We think the test of manipulation must largely be a practical one if the purposes of the Commodity Exchange Act are to be accomplished. The methods and techniques of manipulation are limited only by the ingenuity of man. The aim must be therefore to discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand. In such an inquiry, the question of whether an alleged manipulator has made a profit is largely irrelevant, for the economic harm done by manipulation is just as great whether there has been a profit or a loss in the operation. In the few reported cases where a trader has been found guilty of price manipulation under the Commodity Exchange Act, the available facts indicate that the manipulators reaped handsome profits. In the case of G. H. Miller & Co. v. United States, 260 F.2d 286 (7th Cir. 1958), cert. denied, 358 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959), the manipulators profited in the sum of $162,695.15. Although no figures are given in the case of Great Western Food Distributors, Inc. v. Brannan, 201 F.2d 476 (7th Cir.), cert. denied, 345 U.S. 997, 73 S.Ct. 1140, 97 L.Ed. 1404 (1953), the case clearly indicates that the manipulating parties made profits in their transactions there. And it may be pointed out that one of the most common manipulative devices, the floating of false rumors which affect futures prices, does not involve the commission of an "uneconomic act." Thus we must reject Cargill's contention that manipulation under the Commodity Exchange Act must include the commission of an "uneconomic act."
 
 
 48
 IV. THE ELEMENTS OF THE SQUEEZE IN THE INSTANT CASE
 
 
 49
 We turn now to an analysis of the factual basis of the Government's case against Cargill. As to the factual findings made in the administrative proceeding, the Commodity Exchange Act directs that "the findings of the Secretary of Agriculture as to the facts, if supported by the weight of the evidence, shall * * * be conclusive." Cargill urges that this test is considerably more stringent than the "substantial evidence" test ordinarily applied to review of administrative agency findings. We think the Seventh Circuit adequately described the judical function in these cases as being "to review the record with the purpose of determining whether the finder of the fact was justified, i. e. acted reasonably, in concluding that the evidence, including the demeanor of the witnesses, the reasonable inferences drawn therefrom and other pertinent circumstances, supported his findings." Great Western Food Distributors, Inc. v. Brannan, 201 F.2d at 479-480. With this standard in mind, we examine the individual elements of the squeeze which the Government contends constituted the manipulation in the instant case.
 
 
 50
 A. Did Cargill hold a dominant long position in the future?
 
 
 51
 The first question to be confronted is whether Cargill held a controlling long position in the future. It is evident that a squeeze cannot be successfully executed unless a long has sufficient control of enough futures contracts to force the shorts to come to him to settle their contracts.
 
 
 52
 The Government's case in this aspect lies primarily in the undisputed fact that Cargill held its maximum long position of nearly 2,000,000 bushels until the last fifteen minutes of trading in the future, at which point it controlled 62 per cent of the long interest. On its face, ownership of 62 per cent of the open contracts would appear to be a dominant interest.
 
 
 53
 Cargill, however, argues that the Government's contention is invalid because its emphasis on Cargill's position during the last fifteen minutes of trading is improper. Applying a "reductio ad absurdum" test to the Government's argument, Cargill points out that:
 
 
 54
 "Everyone agrees that the last long in the market in any expiring future will have 100% of the long open interest just as the last short will have 100% of the short open interest. * * * If the contentions of the CEA here were to be sustained, a 'dominant' and controlling long position and a 'dominant' and controlling short position could be found the last day of trading in every commodity future and every delivery month."
 
 
 55
 To this argument, there appear to be two answers.
 
 
 56
 In the first place, the basic question is whether the long controls a sufficient number of contracts to enable him to affect the market sufficiently so as to exact an arbitrary price for his contracts. Situations may well be imagined where the last long in the market during the last few seconds of trading simply does not have sufficient leverage to affect the price. But in the instant case, it appears to us that Cargill's control of 2,000,000 bushels of futures, constituting 62 per cent of the long interest, with 15 minutes of trading remaining, represents a sufficiently controlling position to warrant consideration of the question whether Cargill actually manipulated prices during this period.
 
 
 57
 Secondly, even conceding the most extreme result argued by Cargill, namely that under the Government's analysis the last long in the market would be a dominant long even though he had only a single contract for 5000 bushels, it is difficult to see where this helps Cargill. For the establishment of a dominant long holding is only one aspect of the Government's case; it still must show that the dominant long exacted an artificial price in settlement of his contract. And if this single dominant long does in fact exact an artificial price for his single contract-and the Government can prove it-this would constitute price manipulation in violation of the Act.
 
 
 58
 Thus we conclude that the finding that Cargill acquired a dominant long position is supported by the weight of the evidence.
 
 
 59
 B. Was there an insufficient supply of wheat available from sources other than Cargill for delivery on the May future?
 
 
 60
 The next essential element of the Government's case is to establish that there were not adequate supplies of wheat other than those controlled by Cargill from which the shorts could fulfill their delivery requirements on the future. Obviously, if there were adequate supplies of deliverable grade wheat available to the shorts to deliver to the longs on the future, Cargill would not be able to exact artificial prices in settlement of its contracts, for rather than paying those prices, shorts would instead procure the wheat and deliver it.
 
 
 61
 In order to properly determine what supplies of wheat should be included in those available for delivery on the future, it is necessary to keep in mind the delivery rules of the Chicago Board of Trade. In order to be acceptable for delivery on the future, wheat had to be stored in warehouses located within the Chicago area which were designated regular for delivery by the Chicago Board of Trade, or during the last three days of the delivery month be on track in the Chicago switching district consigned to a designated warehouse. There were no acceptable delivery points outside the Chicago area. No. 2 soft red winter wheat was the standard grade of wheat which was acceptable in fulfillment of the contract. Hard wheat could also be delivered on the contract without penalty, but the evidence clearly shows that hard wheat was a more expensive grade of wheat and no premium was allowed to the shorts for delivering this grade.[9]
 
 
 62
 The evidence as to the availability of these supplies is as follows. It is indisputable that Cargill owned practically all of the available wheat stored in Chicago warehouses. It is also clear that there were practically no supplies of No. 2 soft red winter wheat located within shipping distance of Chicago by the close of trading in the future.[10] However, it appears that there were ample supplies of hard wheat in surrounding areas which could have been shipped to Chicago in time for delivery on the future. Thus the controversy between the parties resolves itself into the question of whether this hard wheat should be considered part of the deliverable supply in determining whether there were stocks available from sources other than Cargill.
 
 
 63
 We conclude that the hard wheat stocks were properly excluded from the available deliverable supply. Case authority under the Commodity Exchange Act which would aid in the determination of this question is meager indeed, and the two cases available appear to have split on the question. In Great Western Food Distributors, Inc. v. Brannan, 201 F.2d 476 (7th Cir. 1953), the Seventh Circuit considered the problem of what supplies should be considered to be available in a corner of the egg market. The three possible sources for delivery on the future were fresh eggs, local refrigerator eggs, and out-of-town eggs. Local refrigerator eggs were the standard deliverable grade on the future. Fresh eggs could be delivered, but their price was higher and no premium was allowed to the short for their delivery. Out-of-town eggs could not be delivered after the close of trading in the future, and even prior to the close of trading, they were not ordinarily delivered because the cost of shipment and added equalizing charge made them more expensive than local refrigerator eggs. The Seventh Circuit therefore concluded that fresh eggs and out-of-town refrigerators should be excluded from the economically available supply.
 
 
 64
 Applying this precedent to our case, we would conclude that out-of-town hard wheat should be excluded from the available supply. Hard wheat was of a higher grade than No. 2 soft red winter wheat, its price was higher, no premium was allowed for its delivery, and the cost of shipment into Chicago for delivery on the future was an additional economic impediment to its delivery. It would be more economic to pay the long a premium than to pay the additional charges for premium wheat plus shipping and handling charges.
 
 
 65
 In apparent conflict with the Seventh Circuit is the Fifth Circuit's decision in Volkart Brothers, Inc. v. Freeman, 311 F.2d 52 (5th Cir. 1962). The Fifth Circuit was considering an alleged manipulative squeeze in the cotton futures market and dealt with the question of what should be considered the available supply of cotton for delivery on the future. There the problem was whether uncertificated, as well as certificated cotton should be considered to be part of the available supply. Certificated cotton only was acceptable for delivery on the future and it was conceded that as of the close of trading in the future, uncertificated cotton could not be certified in time for delivery on the future. Thus the Government contended that it should be excluded from the available supply. The Fifth Circuit disagreed, noting that prior to the close of trading the shorts could have procured the cotton and placed it in the process of certification in time for delivery on the future, and that therefore it should be included in the available supply.
 
 
 66
 The Fifth Circuit reached this conclusion without any economic analysis whatsoever and did not discuss its apparent discrepancy with the Great Western case. Rather it argued that the Government's position simply released the shorts from their delivery obligation in their contract and would result in the futures exchanges becoming gambling enterprises. The Fifth Circuit's decision must be read as holding that squeezes are not a form of manipulation which is prohibited by the Commodity Exchange Act. Regardless of whether one agrees with this theoretical result, the Volkart case cannot be considered as helpful in determining whether the actual economic facts of a squeeze are present in an individual case, for the court did not discuss this problem. We consider later in this opinion whether the Volkart decision that manipulative squeezes should not be regulated is sound, but for purposes of the instant problem in determining what were the available supplies for delivery on the future we do not consider it to be economically realistic. The shorts could usually acquire at considerable extra cost and expense the physical commodity but settle with the longs at an artificially higher price as the lesser of two evils. This would not prevent excessive speculation "causing sudden or unreasonable fluctuations or unwarranted changes" in price condemned in 7 U.S.C. Sec. 6a.
 
 
 67
 There are no Supreme Court precedents on this question under the Commodity Exchange Act. However, in the closely related area of antitrust regulation under the Sherman Act, the Court has given us a test of what products should be considered to be part of the market-i. e. Supply-when determining the existence of monopoly power.
 
 
 68
 "The 'market' which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced-price, use and qualities considered." United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956).
 
 
 69
 Applying that test to the Chicago wheat futures market, we do not think that hard wheat should be included in the supply. The evidence shows that soft red winter wheat is grown mainly in the farm areas surrounding the Chicago market and it is consumed chiefly in that area. It is a deliverable grade wheat at par only on the Chicago Board of Trade in contrast to other contract markets, it is the grade which is generally reflected in the wheat futures price and which is ordinarily delivered in satisfaction of the futures contract. Hard wheat is of a higher quality and price than soft red winter wheat, is rarely delivered on the contract, and no premium is allowed if it is.
 
 
 70
 It may be pointed out also that the Chicago Board of Trade apparently did not consider out-of-town hard wheat to be available for delivery on the futures contract, for otherwise it would not have been necessary for them to set up the rather unusual liquidation procedure described above in closing out the remaining open interest following the close of trading in the future. The fact that Cargill warehouse receipts were recirculated many times in order to close out 370,000 bushels of total 420,000 bushel open interest is itself suggestive of what the available supplies were for delivery on the future.
 
 
 71
 Thus we conclude the finding that hard wheat should be excluded from the available supply was in accord with the weight of the evidence. Since there was no soft red winter wheat available in significant quantities from sources other than Cargill, the conclusion is inescapable that the shorts could not fulfill their contracts, at least to the extent of 2,000,000 bushels, without coming to Cargill for either the offsetting contracts or the warehouse receipts.
 
 
 72
 C. Did Cargill exact an artificially high price in settlement of its long futures contracts?
 
 
 73
 This is the crucial element of the Government's case and the most hotly disputed issue before us. For if, despite the fact that it had the power and opportunity to do so, Cargill did not in fact cause an artificial price it cannot be guilty of manipulation. Actually, there are two questions involved here-was the price which Cargill received for its futures contracts artificially high, and if so, did Cargill cause it?
 
 
 74
 In order to determine whether the price of the future was artificial, some standards or tests must be used to compare normal prices with the prices alleged to be artificial. The Government proposes four different tests for determining whether the price of the May future was artificial and asserts that Cargill's demanded price fails all of them.
 
 
 75
 The first three tests proposed by the Government constitute an historical analysis of the May 1963 futures prices in comparison with the prices for the preceding nine years on the Chicago Board of Trade. We find no serious differences between the parties as to these three tests and shall only summarize them here. First, the Government contends that the record 18 5/8 cents price rise of the future in the last two days of trading was not comparable to movements in the past nine years, and in fact in six of those years the futures price actually declined. Secondly, the Government contends that the spread between the May and July wheat future in 1963 increased a record 18 5/8 cents during the last two trading days, and that no comparable movement occurred during the prior nine years, in seven of those years the spread remaining the same or decreasing. Thirdly, the Government contends that the May 1963 futures price was considerably out of line with the Kansas City futures price as compared with these prior years.
 
 
 76
 We think that the Government's tests with respect to these movements of the futures price are proper and that the weight of the evidence clearly supports the finding that they were abnormal in 1963. Cargill really makes no substantial attack on these findings, although it does rather belatedly suggest in its reply brief that in fact the May 1963 prices were very similar to the May 1958 prices, and thus there was nothing unusual about them. However, even Cargill's own figures demonstrate substantial discrepancies in the May 1963 movements as compared with the May 1958 movements, its argument ignores the other years, and it also ignores the fact that the Government has pointed out that the Department of Agriculture investigated the May 1958 wheat futures prices and found them to be artificial, but no prosecution followed because it was not determined that they were intentionally brought about.
 
 
 77
 The fourth test proposed by the Government for determining the artificiality of the futures price is whether it bore a proper relationship to the price of cash wheat in May 1963 and particularly at the close of trading on May 21. Cargill vigorously joins issue with the Government at this point and the parties are in total disagreement as to what the cash value of wheat was at this time.
 
 
 78
 This is an important element of the Government's case and some more detailed discussion of the mass of conflicting evidence is warranted. In one point, the parties are in apparent agreement. In theory at least the price of the future should be approximately 2 1/2 to 3 cents less than the price of the cash wheat, the discount reflecting warehouse loadout charges; the price of the future may also be depressed somewhat below the cash price because of the uncertainties as to when and what grade of wheat may be delivered.[11] The problem with matching theory to fact lies in the difficulty of determining the cash price of wheat, for actual cash trades on the Chicago spot market are relatively infrequent[12] and the prices of individual transactions may vary greatly depending on the positions of the parties, the quantity involved, and the time of the transaction.
 
 
 79
 The Government's evidence as to the cash price of wheat can be summarized as follows: First of all, the Government relies on an analytical study by a Department of Agriculture expert which established that the average economic value of No. 2 soft red winter wheat at Chicago during May 1963 was within the range of $2.10-2.17. Secondly, it relies on the cash prices of wheat quoted by the Grain Market News, a publication of the Department of Agriculture, which quoted cash prices as substantially below the futures price. Thirdly, it points out that the cash prices as quoted by both the Grain Market News and the Sosland cards, a trade publication, fell rather sharply following the close of trading in the future, and argues that this shows that the cash prices were artificially high due not to basic demand by users but rather by demand from the speculators for delivery on the future.
 
 
 80
 The Government also points out that the prices received by Cargill for its Spanish sales of $2.13 1/2 and $2.09 per bushel, which sales were made only a few days before the end of trading, were substantially below the prices it ultimately received for its futures, and that the prices Cargill received for its remaining grain after the settlement on the contracts were substantially below those prices. While there were some cash sales made on May 20 and 21 in the price range of $2.28 per bushel, there were many other cash sales made between May 20 and May 31 at substantially lower prices.[13]
 
 
 81
 An incident which occurred during the settlement of the open contracts following the close of trading also sheds some light on the cash value of wheat at that time, as well as Cargill's opinion of that value. Goodbody and Company was one of the nine commission firms which had customers with outstanding short contracts in the May future at the close of trading and purchased warehouse receipts from Cargill for $2.28 1/4. After delivering these receipts in satisfaction of the short contracts of its customers, Goodbody discovered that through an error one of its customers was long 10,000 bushels, and an effort was made to sell the receipts in question. They were first offered to Cargill who refused to buy them; Cargill also suggested that "Goodbody try to locate some of the unresolved shorts from the May contract because an outstanding short would pay more to close out his position than Cargill could economically afford to pay." The receipts were then offered to two mills in the area who bid approximately $2.05 per bushel for them. They were finally sold to another commission firm for $2.18 per bushel, which delivered them in satisfaction of short contracts of its customers.
 
 
 82
 As against the Government's evidence as to the cash price of wheat, Cargill presented the following evidence. First, it relied on Sosland card, a trade publication, quotations of the cash prices of wheat which were higher than the Grain Market News quotations, and contended that this was a more reliable source. Secondly, it relied on testimony of two expert witnesses who maintained that the futures price was not out of line with the cash price. It also relied on the testimony of various trade witnesses who testified generally that they thought the futures price reflected basic supply and demand factors. And it relied heavily on the fact that on May 20 and 21 it had made cash sales of wheat for a price of $2.28. It may be pointed out that even assuming that the cash value of wheat was $2.28, according to the theory agreed on by Cargill and the Government, the futures price should then be about $2.25 to reflect the loadout charge. Yet Cargill's sell order was in the range of $2.27-$2.28 1/4.
 
 
 83
 The evidence on this particular point is conflicting, but the preponderance is in favor of the Government. The finding that the futures price was artificially high and did not reflect basic supply and demand factors for cash wheat is supported by the weight of the evidence. And in addition the other three tests proposed by the Government very clearly support the ultimate conclusion that the futures price was artificially high.
 
 
 84
 The question now is whether the artificially high price was caused by Cargill. The Government contends that it was Cargill's withholding of its 2,000,000 bushels of contracts until the last few minutes of trading which caused the dramatic rise in price. Cargill however contends that the price rise simply reflected the traders' judgment that, because of the loadout of the previous weekend for the Spanish sales resulting in the depletion of Chicago supplies, the price of cash wheat would have to rise to meet unfilled mill demand in the area, and that its method of liquidation had nothing whatsoever to do with the price rise.
 
 
 85
 This would seem to be a case where the market pattern speaks for itself. On Friday, May 17, before the Spanish sales were known to the public, the future closed at $2.09 1/2, a price incidentally very close to that for which Cargill made its last Spanish sale. On Monday, May 20, after the Spanish sales were known, the price of the future advanced 9 3/4 cents over the previous day's close. This price rise was gradual throughout the day and was probably attributable to the decrease in supplies. On May 21, the future opened slightly higher than the previous day's close and then gradually declined. It eventually reached a low of $2.15 1/4 at 11:02 and then gradually rose again. At 11:45, the time when Cargill placed its sale order, it was trading at $2.20, which was about 1 1/2 cents over the previous day's close. In other words, throughout the day prior to Cargill's last minute sale the market was resistant to any further increase in the price of the future. Cargill's sell order was at prices 7 and 8 cents over what the future was then selling for, and it was able to get these prices because there was nowhere else for the shorts to go to offset their contracts. It seems clear that the only reason the price advanced so rapidly during the last few minutes of trading was because of Cargill's dominance of the long interest and the high prices it set for liquidation.
 
 
 86
 Cargill argues that its market behavior was not particularly unusual and that other experienced grain merchandisers analyzed the market conditions similarly to Cargill. It points out for example that Ralston-Purina, Inc. and Central Soya Company, both experienced grain merchandisers, had speculative long positions in the May 1963 wheat future and both liquidated their positions at a profit on the last day of trading. It is interesting to compare the transactions of these companies with those of Cargill.
 
 
 87
 Cargill established its speculative long position on April 15 at a time when it had substantial uncommitted stocks in its warehouse. It increased those holdings until May 15, when it held 1,930,000 bushels. After selling 40,000 bushels on May 20, it purchased another 100,000 bushels during the early periods of trading on May 21 and then liquidated those holdings during the last fifteen minutes of trading in the very narrow range of $2.27-$2.28 5/8.
 
 
 88
 Ralston established its long position with the purchase of 150,000 bushels on April 30. It did not increase this position during the month of May. It did not establish its speculative long position until after it had sold all its stocks of wheat, so that it did not own any unhedged and uncommitted stocks. Its liquidation on the last day of trading was as follows:
 
 
 89
 25,000 bushels at $2.18 1/2
50,000 bushels at $2.20 3/4
25,000 bushels at $2.21 1/2
50,000 bushels at the close of trading at $2.28 5/8.
 
 
 90
 It liquidated in that broad range because it wanted to get an average price for the day and could not be certain of the bottom or the top of the market range.
 
 
 91
 Central Soya liquidated its short hedges on its uncommitted stocks on May 1. It did not establish its speculative long position until May 16, when it purchased 220,000 bushels. It did not increase that position. 150,000 bushels of its long futures were liquidated on May 20 for an undisclosed price (but obviously one at $2.19 or less since that was the high for that day). The remaining 70,000 bushels were liquidated on May 21 at $2.22.
 
 
 92
 Mr. Ferguson, a commission broker and witness called by Cargill, testified that he advised his long customers on May 21 to liquidate their contracts a little bit at a time throughout the day in order to get an average for the day. He also testified that, "I would not be inclined to show any broker, just for the sake of his nerves, a 2,000,000 sell order for the last 15 minutes, just for the sake of his nerves."
 
 
 93
 The above evidence suggests that Cargill's method of liquidation cannot be considered to be ordinary market behavior.
 
 
 94
 D. Was the squeeze intentionally caused by Cargill?
 
 
 95
 Cargill was no novice in futures trading and knew of market conditions which could cause a squeeze. It possessed a very valuable piece of information unknown to the trade at large, namely that it owned practically all the wheat available for delivery on the May future. Furthermore, being a large merchandiser in the Chicago area, it was in a particularly advantageous position to take advantage of the potential squeeze in disposing of its supplies as well as being able to take delivery of whatever wheat might be found by the few shorts able to avoid the squeeze in the futures market. Its behavior in liquidating its contracts was clearly intentional and was highly unusual market behavior; and the method of liquidating the unresolved open interest following the close of trading was also unusual and clearly controlled by Cargill.
 
 
 96
 Aside from the obvious inferences to be drawn from the objective facts in this case, there is other evidence in the record which shows that Cargill knew exactly what was going on. On May 6, an inter-office telegram was sent which stated:
 
 
 97
 "Excellent wheat summary. Question is how much wheat going to be available June 15 so we can figure old crop needs and what it going to cost our pals."
 
 
 98
 In an interview with the Department of Agriculture investigators, a Cargill executive said that the Spanish business came about at a good time because without it, if Cargill had "bulled" the market, there would have been criticism. He also said that the sell order was not placed until the last minute because he "waited and watched because he knew the market was going up." This was knowledge other traders did not have.
 
 
 99
 Cargill also argues that it fully intended to take delivery of cash wheat if the futures price did not reach at least $2.27 because it felt it could profitably market the wheat at that price. The evidence is otherwise. It is to be remembered that the wheat market at the end of May was in transition from old crop to new crop. New crop wheat is much cheaper than old crop wheat. Thus both users and merchandisers seek to keep their old crop supplies at the lowest level possible at the end of the crop year in order to be able to take advantage of new crop prices as soon as the new crop is available. It is inconceivable that Cargill would want to take 2,000,000 bushels of old crop wheat to try to merchandise before the new crop came in. In fact Cargill's officers themselves testified that Cargill was liquidating its stocks "to the zero point."
 
 
 100
 If Cargill believed it could merchandise 2,000,000 bushels of cash wheat at $2.27 it is difficult to understand why just the prior weekend it had sold 600,000 bushels to Spain at $2.09. Furthermore, even after the close of trading in the future Cargill did not take delivery of cash wheat but liquidated the bulk of its remaining open position by selling its own warehouse receipts. And it would not even buy back the 10,000 bushels that had been mistakenly sold to Goodbody.
 
 
 101
 The extraordinary price fluctuations of the futures market on May 20 and 21, 1963, on the Chicago Board of Trade were the largest in recent history and had very little relationship to basic supply and demand factors on No. 2 soft red winter wheat. None of the other markets was so affected. The cash market in Chicago was to a limited degree cornered due to the depletion of local supplies. This small corner however does not appear to have been manipulated but came about normally from accelerated liquidation of the old wheat crop. There was no appreciable demand for additional cash wheat except for a few mill grind requirements. The long futures holders were not standing for delivery but for the maximum possible price, which Cargill was able to obtain to a substantial degree by bulling the futures market in the last 7 minutes of trading and in employing the method of liquidation utilized after the trading closed. Cargill did not sell at the market price but set the market price by reason of its dominant long position in the closing 7 minutes. The cash market quickly adjusted to the demand at the close out of the old crop and prices dropped substantially to where they were prior to the last few days of the futures trading.
 
 
 102
 The conclusion is well founded that these severe fluctuations were caused by Cargill's manipulative actions and such severe fluctuations constitute a threat to a free and orderly market. It is difficult for us to perceive how Cargill can ignore the fact that its second Spanish sale at $2.09, which was offered on May 15 and confirmed on May 18, is a true indicator of an unmanipulated cash market. This constituted a good economic sale, which we may concede, but it is difficult to view the true cash market at $2.28 a few days later.
 
 
 103
 The 18 5/8 cents rise in the futures price would have to be caused primarily by Cargill's dominance of the long futures market during the closing minutes of trading and its liquidation thereafter of its long futures. The shorts as a practical matter had nowhere else to go except to Cargill and Cargill knew it. The Spanish sales while completely legal did temporarily deplete local supplies and laid the base for a squeeze by the dominant longs. The rise of futures to the maximum permissible of $2.28 5/8 was no corrective action to bring futures in line with the cash market, which was substantially lower up to the last day of trading and returned to its previous lows for the month after the squeeze had been effected and the shorts liquidated. It thus appears that Cargill exploited its position in this tight situation, while most of the other longs did not.
 
 
 104
 We conclude that the squeeze was intentionally brought about and exploited by Cargill.
 
 
 105
 Cargill also argues that it cannot be found guilty of manipulation because it was relying on Volkart Bros., Inc. v. Freeman, 311 F.2d 52 (5th Cir. 1962), and the advice of its counsel that all its activities were perfectly legal. We cannot agree that reliance on the Volkart decision can preclude a finding that Cargill was guilty of manipulation if this court should conclude that Volkart was wrongly decided or not determinative in the instant case. In the first place, the Volkart decision does not represent a clearly defined line of cases establishing a definitive standard of acceptable conduct under the statute prohibiting manipulation; it is in substantial conflict with both Great Western Distributors, Inc. v. Brannan, 201 F.2d 476 (7th Cir. 1953) and G. H. Miller & Co. v. United States, 260 F.2d 286 (7th Cir. 1958). Cargill was clearly picking and choosing which precedent it would follow. And the Volkart decision has been criticized by commentators.[14] Secondly, Cargill was playing close to the line of even the Volkart decision. Both the hearing referee and the Judicial Officer pointed out distinctions between this case and Volkart.[15] Finally the Judicial Officer took into consideration Cargill's alleged reliance on Volkart and suspended all sanctions. We do not believe anything more is required if we conclude that this manipulation is in fact prohibited by the Commodity Exchange Act. Compare Simpson v. Union Oil Co., 396 U.S. 13, 90 S.Ct. 30, 24 L.Ed. 13 (1969), reversing 411 F.2d 897 (9th Cir.).
 
 
 106
 We turn now to a discussion of the Volkart case.
 
 
 107
 V. THE VOLKART DECISION AND MANIPULATIVE SQUEEZES
 
 
 108
 Read at its broadest reach, which is the way Cargill reads it, the Volkart decision holds that manipulative squeezes are not prohibited by the Commodity Exchange Act. It is somewhat difficult to discern why the Court reached this result, but apparently its concern was that a contrary result would relieve the shorts of their delivery obligation and transform the futures contract into a gambling transaction. We think this approach disregards commercial reality and the economic functions of the futures market.
 
 
 109
 While the obligation to make or take delivery is a bona fide feature of the futures contract, in reality the futures market is not an alternative spot market for the commodity itself, and indeed the functions performed by the futures market would probably be severely hampered if it were turned into an alternative spot market. Most parties who engage in futures transactions are in no position to either make or take delivery, and if they were required to always make preparations to fulfill their obligations to make or take delivery, the number of persons who could effectively participate in the futures market would be substantially restricted, thus reducting the liquidity and volume of that market. The main economic functions performed by the futures market are the stabilization of commodity prices, the provision of reliable pricing information, and the insurance against loss from price fluctuation. The functions can be fulfilled only if both longs and shorts can be assured that they can offset their contracts at non-manipulated prices. If in a squeeze situation, the shorts must be forced either to pay manipulated prices to offset their contracts or in the alternative to bring in higher priced outside supplies which are neither wanted nor needed in the local market, then both the cash and the futures markets will be dislocated. Cargill's transactions in the liquidation of its futures contracts produced such a dislocation in the futures market in the instant case and we cannot conceive that any useful purpose would be served by encouraging such conduct in the future.
 
 
 110
 Cargill argues in its brief that this position "leaves the long at the mercy of the shorts in local shortage situations, and * * * will succeed only in eventually destroying futures markets. * * * Further, it is clear that if the long is not permitted to ask what, in his judgment, is a price reflecting the cost of bringing in wheat from outside, the futures market is no longer reflecting the real supply-demand situation, but is artificially low, and the prices are therefore useless to the trade and nation."
 
 
 111
 The first answer to this argument is that it is difficult to imagine a local shortage situation in which the long is at the mercy of the short. Cargill was certainly not at the mercy of the shorts in May 1963 and would not have been had it even liquidated its holdings in an orderly fashion. And had it so liquidated its holdings, it would still have made a handsome profit on its investment, even without the added increment which its manipulation produced. The second answer is that we have been shown no good reason why the futures price should reflect the cost of bringing in a higher price and grade of wheat for which there is no demand in the local area. It is this price which was artificially high and therefore useless to the trade and nation.
 
 
 112
 Thus we conclude that if the Volkart decision is to be interpreted as prohibiting regulation of manipulative squeezes, it is not in line with the Commodity Exchange Act, 7 U.S.C. Sec. 1 et seq., providing for competitive trading markets and proscribing excessive speculation, and should not be followed.
 
 PROCEDURAL CLAIM AND OTHER CONTENTIONS
 
 113
 Cargill argues that the instant proceeding is void because there was no advance notice given to it that its conduct was violative of the statute, as required by the Administrative Procedure Act, 5 U.S.C. Sec. 558(c), which provides as follows:
 
 
 114
 "* * * Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given-
 
 
 115
 "(1) notice by the agency in writing of the facts or conduct which may warrant the action; and
 
 
 116
 "(2) opportunity to demonstrate or achieve compliance with all lawful requirements."
 
 
 117
 We think it is clear that Cargill's acts were willful within the meaning of the Act and thus the section is not applicable. See Great Western Distributors, supra, 201 F.2d at 484.
 
 
 118
 Cargill also contends that the proceedings were void because of the bias and prejudice of the referee and the reviewing judicial Officer. We find no merit to these contentions.
 
 
 119
 The order is affirmed.
 
 
 
 [1]
 Cargill was also charged with cornering or manipulating the cash market on wheat in Chicago on May 20 and 21, 1963 and the hearing referee so found; but this charge was not sustained by the Judicial Officer, acting on behalf of the Secretary of Agriculture
 
 
 [2]
 As a matter of reality and practice rarely does a future commodity dealer actually intend to take or make delivery on that commodity. Commentators estimate it to be less than 1 per cent
 Even persons engaged in genuine hedging operations generally do not intend to make or take delivery. Belveal, Charting Commodity Market Price Behavior (1969), p. 156; Working, "Economic Functions of Futures Markets," in Futures Trading in Livestock (1970), p. 20; Merrill Lynch, Pierce, Fenner & Smith, The Hedger's Handbook (1970), p. 7.
 
 
 [3]
 The position limits referred to above of two million bushels apply only to speculative positions. Since Cargill's position at this point was a bona fide hedge, its holding of eight million bushels did not violate the position limits. Chicago has a total elevator capacity of around 70,000,000 bushels, of which Cargill owns and operates 22,000,000 bushels
 
 
 [4]
 There is no controversy between the parties that Cargill's position was speculative. There are situations of course in which a grain merchandiser's long futures position might be hedging, such as where he has made sales of cash wheat which he does not have sufficient supplies on hand to fulfill; in such a case he might purchase futures in order to assure himself of supplies to meet his commitments. However, at the time Cargill established its long futures position it had ample supplies of uncommitted wheat stocks, and thus its position was speculative
 
 
 [5]
 United States exporters cannot meet world price competition in wheat without the benefit of government export subsidies
 
 
 [6]
 There apparently were a few other much smaller stocks located in Chicago warehouses. These stocks, however, were all owned by grain mills which needed them for their own grind requirements, and hence they were not available for delivery
 Actually as of May 16, 1963 all of Cargill's soft red winter wheat located in Chicago was committed on offers and sales.
 
 
 [7]
 Most commentators refer to a dominant position in the cash or spot market as a corner, while such position in the futures market is denoted as a squeeze. See 73 Yale L.J. 171 (1963)
 
 
 [8]
 One of the most spectacular reported cases illustrating such a corner is Peto v. Howell, 101 F.2d 353 (7th Cir. 1938). It was there alleged, and the court found that the evidence substantiated the allegations, that the defendant acquired long futures in corn in the amount of 8,500,000 bushels to be delivered in Chicago; that approximately 7,000,000 bushels were delivered to the defendant in satisfaction of these contracts, which constituted 97 per cent of the deliverable supply in Chicago and 90 per cent of the deliverable supply in the whole country; that there remained 1,500,000 bushels of futures which could therefore not be satisfied by delivery; and that the defendant was therefore able to dictate an arbitrarily high price in settlement of these contracts
 Not all corners of course are so massive or so successful.
 
 
 [9]
 It might be pointed out that many of the problems in this case might well be eliminated if Board of Trade rules were changed to allow a premium for delivery of hard wheat
 
 
 [10]
 Cargill strenuously urges on this review that there were ample supplies of wheat available for delivery on the future that could have been shipped into Chicago, while conceding there were insufficient supplies in Chicago itself. It is somewhat unclear whether Cargill is contending that these outside supplies included both No. 2 soft red winter wheat as well as hard wheat or has admitted that these supplies were limited to hard wheat. However, the evidence is nearly conclusive, including testimony from Cargill's own witnesses and officers, that these supplies were limited to hard wheat
 
 
 [11]
 This was established by witnesses for both Cargill and the Government. Testimony of Cargill's witnesses Dr. Gray and Jaffray and the Government's witness Dr. Robinson
 
 
 [12]
 From February 21, 1963 to the closing of the May futures on May 21, 1963 there was only one sale on the spot market
 
 
 [13]
 There was very little demand for cash wheat at this time. The new crop would be available the first part of June. Old stocks were being liquidated and there was no need for the old wheat except for a few mills who were short on their grind requirements. The cash price quoted by USDA Grain News:
 May 17 2.15 1/2
May 20 2.18 3/4
May 21 2.28
May 22 2.15
May 23 2.11 1/8
May 29 2.03 3/8
 Sosland Trade Publication showed quotations:
 May 20 2.27 1/2
May 21 2.40
May 22 2.09
May 24 2.11
May 31 2.03 3/8 bid.
 
 
 [14]
 See "The Delivery Requirement: An Illusory Bar to Regulation of Manipulation in Commodity Exchanges," 73 Yale Law J. 171 (1963)
 
 
 [15]
 For example, Volkart contended that its position was a hedge, not speculative. Furthermore, Volkart did not control a significant amount of the spot commodity and had not contributed to its shortage, whereas Cargill controlled almost all the available cash wheat and was responsible in large part for the existing shortage by its Spanish sales. Finally, the Fifth Circuit found no evidence of intent to manipulate on the part of Volkart