Ron C. HORN, Appellee,

v.

RAY E. FRIEDMAN & COMPANY,
Thomas H. Dittmer, Appellants.

Nos. 84–2463, 85–1143.

United States Court of Appeals,
Eighth Circuit.

Submitted June 11, 1985.

Decided Nov. 7, 1985.

Rehearing Denied Dec. 5, 1985.

William H. Sutton, Little Rock, Ark., for appellants.

G. Alan Wooten, Fort Smith, Ark., for appellee.

Before HEANEY and BOWMAN, Circuit Judges, and WANGELIN,* Senior District Judge.

BOWMAN, Circuit Judge.

This is another in a series of cases arising from commodity transactions occurring in the Springdale, Arkansas office of Refco, Inc., a commodity brokerage business registered on the Chicago Mercantile Exchange (CME). The plaintiff, Ron C. Horn, brought suit against Refco and its president, Thomas Dittmer, alleging that defendants made fraudulent misrepresentations and breached their fiduciary duties to him. In addition, Horn claimed that Dittmer's actions violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 *et seq.* Refco counterclaimed for the unpaid debit balance of $448,415.09 in Horn's commodity futures trading account.

The case was tried to a jury. By consent of the parties, a magistrate presided over the trial. *See* 28 U.S.C. § 636(c). At trial, the magistrate denied defendants' motion for directed verdicts on plaintiff's claims and on Refco's counterclaim and the case was submitted to the jury. The jury returned a verdict in favor of Horn on all of his claims and against Refco on its counterclaim. Defendants timely moved for judgment n.o.v. on Horn's claims and on Refco's counterclaim. The motion was denied. Defendants now appeal from the entry of judgment by the District Court on the jury's verdict. Defendants assert as error the denial of their motion for directed verdicts and the subsequent award to plaintiff of attorneys' fees and costs under the provisions of RICO. We reverse.

## I.

From 1978 to 1981, Horn was an account executive or "broker" in the Springdale office of Refco. During that period Horn traded commodities both for customer accounts and for his own personal account. On October 2, 1979, Horn purchased for his personal account 100 contracts in the December 1979 live cattle futures market, purportedly on the basis of representations by Ed Apel, a trader on the floor of the CME and a close personal friend of Robert Bone. Bone was a broker in and the *de facto* manager of Refco's Springdale office. Apel told Bone that he had spoken with Dittmer that morning and that Dittmer agreed that the correct position in the cattle futures market was the long position. Horn learned of Dittmer's opinion from Bone. By the close of trading on October 2, cattle futures had declined the maximum amount allowed by the CME in any one day.

On the morning of October 3, 1979, Horn spoke with Bruce Strange, the official manager of the Springdale office. Strange informed Horn that he had talked with Dittmer earlier that morning and that Dittmer thought that "everything was all right." Dittmer also indicated to Strange that he would "support" the market to keep the price of live cattle futures contracts from

---

* The HONORABLE H. KENNETH WANGELIN, Senior United States District Judge for the Eastern and Western Districts of Missouri.

dropping any further. Horn, on the basis of this conversation with Strange, purchased for his personal account an additional 100 long contracts for December 1979 live cattle. Horn at no time spoke with Dittmer or heard Dittmer express his opinion directly. After rising somewhat on October 3, the cattle futures market continued to decline, resulting in substantial losses for Horn.

In December 1981, Horn filed this suit to recover losses resulting from his cattle futures trades on October 2–3, 1979. Horn's claims were submitted to the jury on theories that Refco and Dittmer breached their fiduciary duties to Horn and committed fraud under section 4b of the Commodity Exchange Act (CEA), 7 U.S.C. § 6b, and on the theory that Dittmer violated RICO. Horn's claims are based in part on allegations that Dittmer had represented that the supply of cattle in feedlots in which he owned interests was low, when in fact the lots were at full capacity. Horn contends that this representation was intended to induce him and others to take long positions in the market so as to create artificially high demand for cattle futures contracts. He argues that by driving the price of cattle futures up in this manner, Dittmer could close out his own long positions and establish short positions just when the market peaked, thereby making large profits. Thus Horn asserts that for personal gain Dittmer actually was trading precisely opposite the advice that he was giving others concerning the cattle futures market.

## II.

Refco and Dittmer contend that the magistrate erred by not granting their motion for directed verdicts. Our review of the denial of a motion for a directed verdict is governed by the same standard applicable to the trial court's determination of the matter. A directed verdict is appropriate only when the evidence, viewed in the light most favorable to the non-moving party, is not sufficient to create an issue of fact for the jury. *Greenwood v. Dittmer*, 776 F.2d 785, 788 (8th Cir.1985); *Kropp v. Ziebarth*, 601 F.2d 1348, 1352 (8th Cir.1979). Our review of each of plaintiff's claims convinces us that Horn failed to make a submissible case and that the trial court erroneously failed to grant defendants' motion for directed verdicts or for judgment n.o.v.

## A.

Defendants first argue that the trial court improperly denied their motion for a directed verdict on the breach of fiduciary duties claim. Refco and Dittmer contend that any basis for finding a fiduciary relationship between defendants and Horn in regard to this matter is totally lacking. Defendants point to the non-discretionary nature of the trading account as indicated by Horn's placement of all orders therein, and to the absence of any direct contact between Dittmer and Horn. Horn concedes that defendants did not control the trading in his account but seeks to justify the submission of the fiduciary duties claim by insisting that his status as a customer and an employee of defendants created a fiduciary relationship.

Whether a fiduciary relationship exists in any particular circumstance is a question of state law. *McGinn v. Merrill Lynch, Pierce, Fenner & Smith*, 736 F.2d 1254, 1258 (8th Cir.1984). Our survey of Arkansas law discloses no authority for the proposition that a fiduciary relationship could exist on the facts of this case. While judicial opinions invoking the law of other jurisdictions are no more than persuasive authority as to what Arkansas law is on this question, we observe that in *Ray E. Friedman & Co. v. Jenkins*, 738 F.2d 251, 254 (8th Cir.1984), a diversity case from North Dakota, this Court stated that "[s]ince the account was non-discretionary and controlled by [the customer], there is likewise no merit in his contention that an instruction on fiduciary duty should have been given." We believe that a similar conclusion should be drawn in the present case.

As in *Jenkins*, Horn's account was non-discretionary and in fact was traded by

Horn himself. Moreover, the record indicates that Dittmer and Horn did not speak with each other concerning the live cattle contracts in question and that they did not even know each other. Even assuming that Dittmer had made representations directly to Horn, the mere expression of an opinion does not create a fiduciary relationship. Likewise, we do not believe that fiduciary duties arose here by virtue of Horn's status as an employee of Refco. A contrary result would have the perverse effect of creating fiduciary relationships between a brokerage house and its employees when no fiduciary relationship would exist between the brokerage house and similarly situated customers. We are unable to discern anything in the facts of this case sufficient to give rise to a fiduciary duty owed by either defendant to Horn, and we therefore hold that the trial court erred in failing to grant defendants' motion for a directed verdict or judgment n.o.v. on this claim.

### B.

■ Defendants next assert that there was insufficient evidence to warrant submission to the jury of Horn's fraud claim under section 4b of the CEA. The elements of a fraud action under section 4b are derived from the common-law action for fraud. *See Greenwood,* at 789 n. 4. As we noted in *Greenwood,* "[a] common-law action for fraud requires a false representation of a material fact with knowledge or belief on the part of the defendant that the representation is false. The false representation must be made with the intent to induce the other party to rely upon that representation." *Id.* at 789 (citations omitted). In addition, the plaintiff must show that any damage resulted from his justifiable reliance on the defendant's misrepresentation. *See Prosser and Keeton on The Law of Torts* § 108 (W. Keeton 5th ed. 1984); *Restatement (Second) of Torts* § 537 (1977).

Horn argues that the evidence was sufficient to establish fraud on the part of defendants on three separate grounds, each

of which we will address in turn. First, Horn claims that in August and September 1979 Dittmer misrepresented that the supply of cattle in his feedlots was low to induce Horn to purchase cattle futures contracts. Horn purports to substantiate his claim of misrepresentation by reference to a subsequent statement in a hedge application which Dittmer filed with the CME on October 5, 1979, declaring that his feedlots were "at capacity."

■ Our review of the record has failed to disclose any evidence that would show that a misrepresentation was made. Dittmer's alleged statements that the supply of cattle in his feedlots was low were made in August and September 1979. The statement in the hedge application that his feedlots were at capacity was made in October 1979. Both statements may have been true, and Horn has made no showing to the contrary. We therefore are unable to conclude that these representations are sufficient to make a submissible case of fraud.

Second, Horn asserts that Dittmer misrepresented to Apel on October 2, 1979 that he expected the price of October and December cattle futures contracts to rise and that he believed a long position in those contracts was correct. Horn claims that Dittmer was aware that Apel would relay this information to Bone and that it would then be disseminated throughout the Springdale office. Dittmer's fraudulent intent is revealed, according to Horn, by Dittmer's closing out long positions in cattle futures contracts on the same day.

■ We note that the manner in which Horn learned of Dittmer's purported opinion was indirect and uncertain to occur. We need not pause over the attenuated nature of the communication, however, because we think that in any event the statement does not rise to the level of actionable fraud. Dittmer's statement amounts to nothing more than the expression of his opinion concerning the cattle futures market. An expression of opinion may constitute fraud only if the actor knew when stating the opinion that it was false. *Vick-*

*ers v. Gifford-Hill & Co.*, 534 F.2d 1311, 1316 (8th Cir.1976).

There is nothing in the record of this case to indicate that Dittmer thought or knew that the statement was false when made. Trading activity in Dittmer's personal trading account supports this view. Dittmer was consistently in a long position in the cattle futures market when he was allegedly advising Horn to take long positions during August and September and until he began to sell his positions on October 2. Our conclusion is not altered by Dittmer's closing out many of his long positions on the afternoon of October 2. Dittmer spoke with Apel early on the morning of October 2. In view of the volatile nature of commodities futures markets, Dittmer's opinion concerning the market could very easily have changed shortly thereafter. Moreover, commodity traders take positions in the market for a variety of reasons, and thus, at any given time, a trader's market position may not reflect his opinion concerning long-term market trends. We decline to penalize traders who react successfully to market fluctuations after earlier expressing an opinion regarding the direction the market may take in the future.

Third, Horn argues that Dittmer's statement to Strange on the morning of October 3, 1979, indicating that "everything would be all right" and that he would "support" the market, was fraudulent. Again, Horn claims that Dittmer's closing out the remainder of his long positions in the cattle futures market reflects Dittmer's fraudulent intent.

■ As we noted above, a trader's position in the market at a given moment is influenced by a variety of factors and is not necessarily based upon his opinion as to future market trends. We note further that the record of Dittmer's personal trading activity after October 5, 1979 reveals that he continued to take some long positions, as well as some short positions, throughout the rest of the month. In addition, we question whether an experienced trader and broker such as Horn, who has been a licensed commodities broker since 1971, could reasonably have relied on a representation that one individual was going to "support" the market. The vast number of contracts traded on the cattle futures market and the large number of cattle that those contracts represent make it unlikely that Horn justifiably could have believed that Dittmer possessed sufficient market power to have a significant effect on the cattle futures market. Horn has made no showing of any factual basis for a reasonable belief that Dittmer possessed this kind of market power. The only evidence in the record relevant to this point is the testimony of defendants' expert, who stated that Dittmer's activities would have had an insignificant effect on market prices or market movement, and Horn offered nothing to counter this testimony.

Because we do not find a sufficient factual basis for submitting the section 4b claim to the jury, we conclude that the trial court erred when it did not grant defendants' motion for a directed verdict or judgment n.o.v. on this claim.

## C.

■ Defendants further contend that the trial court erred in failing to direct a verdict in favor of Dittmer on Horn's RICO claim and, therefore, that the trial court's award of attorneys' fees and costs under the provisions of RICO was also erroneous. Horn alleged that Dittmer violated RICO by contravening the wire fraud provision of 18 U.S.C. § 1343,[1] which is included in RICO as one of the predicate acts constitut-

---

1. Section 1343 provides:

    Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be trans-

    mitted by means of wire ... any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

782

ing "racketeering activity."[2] Because we have concluded that Horn did not make a submissible case of fraud against Dittmer, we likewise hold that there was insufficient evidence to send the RICO count to the jury. Not having been shown to have committed any fraudulent act, Dittmer could not have violated section 1343. Thus Dittmer's motion for a directed verdict or judgment n.o.v. on Horn's RICO claim should have been granted. Accordingly, the award of attorneys' fees and costs under the applicable provision of RICO, 18 U.S.C. § 1964(c), must also fail.

### III.

The last issue for our consideration is Refco's contention that the trial court erred in failing to grant its motion for a directed verdict on its counterclaim for the debit balance in Horn's account. Our review of this issue has been hampered by the cursory manner in which it was treated in the briefs of the parties. Nevertheless, our extensive review of the record has failed to disclose any defense to Refco's counterclaim other than the fraud allegations discussed earlier in this opinion. Horn does not deny the existence of the debit balance but instead contends only that it resulted because of defendants' fraudulent conduct. *See* Trial Transcript at 487–90. Since Horn did not make a submissible case on his fraud claims, no issue of fact remained for the jury and a directed verdict or judgment n.o.v. should have been entered in favor of Refco on its counterclaim.

The judgment of the District Court is reversed.

---

**2.** 18 U.S.C. § 1962(c) prohibits any person affiliated with an entity pursuing activities that affect interstate commerce from engaging in a "pattern of racketeering activity." "Racketeering activity" is defined to include any act which would render the person performing the act subject to indictment under 18 U.S.C. § 1343. 18 U.S.C. § 1961(1)(B).