947 F.2d 321
 1991-2 Trade Cases P 69,617, RICO Bus.Disp.Guide 7860
 William UTESCH, a resident of the State of Iowa, Triple U
Ranch, an Iowa limited partnership, Rod Amlie, Kenneth
Becker, Marcel Becker, Leon Bruns, Merlyn Hegland, Floyd
Jansma, Stanley Pankratz, Estate of Carl Pennings, Lee
Stoll, Carl Winterboar, and Thane Wulf,
and
Clarence Vos, a resident of the State of Iowa, Idlewild
Farms, Inc., an Iowa corporation, Vos Company, an
Iowa limited partnership,
and
Victor C. Tomka, a resident of the State of Iowa,
and
Mick Drea, a resident of the State of Iowa,
Plaintiffs-Appellees/Cross-Appellants,
v.
Thomas H. DITTMER, a resident of the State of Illinois, and
Refco, Inc., formerly known as Ray E. Friedman &
Company, Inc., an Illinois corporation,
Defendants-Appellants/Cross-Appellees.
 Nos. 90-2735, 90-2740.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 8, 1991.
Decided Oct. 17, 1991.
 
 Elizabeth J. Robben, Little Rock, Ark., argued (Kevin A. Crass, on brief), for defendants-appellants/cross-appellees.
 David H. Weinstein, Philadelphia, Pa., argued (Robert S. Kitchenoff, Philadelphia, Pa., Robert B. Scism, Des Moines, Iowa, Robert H. Weir, San Jose, Cal., on brief), for plaintiffs-appellees/cross-appellants.
 Before LAY, Chief Judge, FRIEDMAN,* Senior Circuit Judge, and John R. GIBSON, Circuit Judge.
 FRIEDMAN, Senior Circuit Judge.
 
 
 1
 These are an appeal and a cross-appeal from a judgment of the United States District Court for the Northern District of Iowa (O'Brien, C.J.), entered on a jury verdict, awarding damages for violation of section 9(b) of the Commodities Exchange Act (Commodities Act), 7 U.S.C. § 13(b) (1976), section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1976), and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962 (1976). We reverse because the evidence is insufficient to support the jury verdict.
 
 I.
 
 2
 A. This case grows out of 1979 transactions in the cattle futures market by the appellants Dittmer and Refco, Inc. It is the sixth appeal to us in damage suits growing out of those transactions.
 
 
 3
 The five previous appeals were suits brought against the appellants by brokers and customers of Refco for losses they allegedly sustained as a result of the appellants' transactions. In all of them, the appellants prevailed. See, Dudley v. Dittmer, 795 F.2d 669 (8th Cir.1986) (reversing jury verdict in favor of Refco broker under antifraud provisions of Commodities Act, and remanding for new trial on market manipulation charge under that Act); Greenwood v. Dittmer, 776 F.2d 785 (8th Cir.1985) (affirming j.n.o.v. in favor of defendants in suit by Refco customer under the Commodities Act); Horn v. Ray E. Friedman & Co., 776 F.2d 777 (8th Cir.1985) (reversing jury verdict in favor of Refco broker in suit under Commodities Act and RICO); Bone v. Refco, Inc., 774 F.2d 235 (8th Cir.1985) (vacating jury verdict in favor of Refco broker for breach of contract, and remanding for new trial); McIlroy v. Dittmer, 732 F.2d 98 (8th Cir.1984) (affirming jury verdict in favor of defendants in suit by Refco customer under Commodities Act).
 
 
 4
 The plaintiffs in the instant case, however, were all cattle farmers who sold cattle in 1979. They claim damages on the theory that the appellants' transactions artificially reduced cattle prices in the Fall of 1979, thereby reducing the amount they received on the sale of their cattle.
 
 
 5
 B. A brief description of the "cash" and "futures" markets, in which cattle transactions take place, is necessary. The following discussion is based upon the testimony of the plaintiffs' expert, Professor Helmuth. See also the description of commodities markets in Judge Friendly's opinion for the court in Leist v. Simplot, 638 F.2d 283, 286-88 (2d Cir.1980), and in the affirming opinion of the Supreme Court in Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 357-60, 102 S.Ct. 1825, 1828-30, 72 L.Ed.2d 182 (1982).
 
 
 6
 There are two distinct markets in which cattle transactions take place: The "cash" market and the "futures" market. In the cash market, cattle are directly bought and sold. "Fat" or "live" cattle is cattle that is ready for slaughtering and processing. Feeder cattle are younger and lighter animals that will be fed and fattened to prepare them for slaughter.
 
 
 7
 A cattle futures contract is an agreement by which a person agrees to make or accept delivery of a stated amount of cattle in a designated future month at a specified price. A single "fat" or "live" cattle contract generally covers 40,000 lbs. of live cattle generally weighing 1050 lbs. each, so that each contract ordinarily covers 38-40 head of cattle. At the time of the transactions involved in this case, cattle futures contracts were traded on the Chicago Mercantile Exchange (Exchange).
 
 
 8
 One who sells a contract agrees to make delivery in a designated month, and one who buys a contract agrees to accept delivery. "Going short" is "synonymous with selling a contract" and "going long" is "synonymous with buying a contract."
 
 
 9
 Contracts are designated by the delivery month, e.g., an "October 1979 live cattle contract." The contract does not specify any particular date of the month in which delivery must be made, and the seller may select the delivery date.
 
 
 10
 Relatively few futures contracts result in actual deliveries of cattle. Normally, one who is long or short will offset his position by buying the same number of contracts of the opposite kind to equal his commitment. This is referred to as "liquidating a position."
 
 
 11
 People trade in the futures market either as speculation or as a "hedge." For example, farmers raising cattle for a future sale, whose profits depend upon the price they receive when such sale is made, may "hedge" against a low selling price by selling a futures contract for delivery at a stated price, and thus insuring themselves that price.
 
 
 12
 Regulations of the Exchange limit any one person to holding 450 speculative contracts for any particular month, which must be reduced to 300 contracts when that month is reached.
 
 
 13
 C. In 1979, the appellant Dittmer was the president, chairman and sole stockholder of the appellant Ray E. Friedman & Co. (Refco). Refco was a commodities futures commission merchant which employed a number of brokers and executed trades on the Exchange for its customers. Dittmer had a trading account with Refco and engaged in extensive cattle feeding operations, both directly and through entities in which he had an interest.
 
 
 14
 In 1983, eight cattle-raising farmers filed five separate suits against Dittmer and Refco; in 1985, four of the suits were consolidated for discovery purposes; and in 1988 the court permitted 13 additional plaintiffs to join the suit, but refused to certify the suit as a class action. The plaintiffs then filed an amended complaint which alleged that between April and October 1979, Dittmer and Refco conducted an elaborate scheme to manipulate the prices of the October and December 1979 live cattle futures contracts in order to reap substantial trading profits and to reduce competition from small cattle producers.
 
 
 15
 The scheme, according to the plaintiffs, had three stages. First, Dittmer and Refco established long positions in the May 1979 feeder cattle contract and the June and August 1979 live cattle contracts, thereby acquiring the right to obtain a large number of cattle that would be ready for delivery in the October 1979 market. Second, in order to increase the price of the October futures contract, Dittmer urged Refco brokers and customers to take long positions in the October and December 1979 live cattle contracts by representing that there would be significant price increases in the cash price of cattle for those months. Third, in the first week of October 1979, Dittmer and Refco closed out their long positions, took short positions, began to make massive deliveries of their cattle in the market, and tendered notices of intent to deliver even larger amounts of cattle.
 
 
 16
 The complaint asserted that this conduct of Dittmer and others operating in concert and conspiracy with him constituted (1) "a manipulation and corner of the cattle futures markets in violation of Section 9(b) of the Commodities Exchange Act, 7 U.S.C. § 13(b) (1976)" (Count I), (2) "an unlawful combination and conspiracy in restraint of trade in the marketing of cattle in violation of Section 1 of the Sherman Act. 15 U.S.C. § 1 (1976)" (Count II) and (3) the conduct of interstate enterprises "through a pattern of racketeering activity" in violation of RICO (Count III).
 
 
 17
 At the jury trial, each individual plaintiff testified to the price and quantity of the cattle he or she sold in the cash market during the relevant period. The plaintiffs introduced testimony that was given in one of the previous five cases against Dittmer and Refco, Horn v. Ray E. Friedman & Co., 776 F.2d 777 (8th Cir.1985), which was read to the jury in question and answer form. The plaintiffs also presented testimony by two expert witnesses, which had not been presented in that earlier case, and Dittmer also testified.
 
 
 18
 The jury rendered a special verdict in favor of the plaintiffs on all three counts and awarded damages totalling $229,414.77, which the district court trebled under the Sherman Act and RICO counts. The court denied the defendant's motion for judgment notwithstanding the verdict or for a new trial. Utesch v. Dittmer, Nos. C 83-4154, C 83-4155, C 83-4156, C 83-4158 (N.D.Iowa Sept. 7, 1990).
 
 
 19
 D. Dittmer and Refco challenge the judgment against them on numerous grounds. They contend that the plaintiffs had no standing to maintain a private right of action under any of the three statutes upon which their complaint was based, that the evidence does not support the verdict, that the statute of limitations barred the claims of some of the plaintiffs, that some of the plaintiffs were improperly permitted to recover on claims belonging to partnerships and corporations, and that evidence was improperly admitted. The plaintiffs' cross-appeal challenges the district court's refusal to certify the suit as a class action and to award prejudgment interest.
 
 
 20
 We find it unnecessary to address most of these contentions, since we conclude that the evidence was insufficient to support the jury verdict on any of the counts and that the judgment in favor of the plaintiffs against the defendants, therefore, must be reversed. That conclusion makes the cross-appeal moot.
 
 
 21
 II. The Commodities Exchange Act Count.
 
 
 22
 At the time the events in this case arose, section 9(b) of the Commodities Exchange Act made it illegal
 
 
 23
 for any person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any contract market, or to corner or attempt to corner any such commodity, or knowingly to deliver or cause to be delivered for transmission through the mails or in interstate commerce ... false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce....
 
 
 24
 7 U.S.C. § 13(b) (1976). A private suit may be maintained for violations of this provision. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982).
 
 
 25
 The district court charged the jury that the plaintiffs could recover under their Commodities Act claim under alternative theories: (1) that the defendants "manipulated the price of October 1979 live cattle futures" or (2) that the defendants "knowingly delivered or caused to be delivered in interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning market information or conditions that affect the price of any commodity in interstate commerce."
 
 
 26
 The court further charged: to prove manipulation, the plaintiffs were required to prove that the defendants "created an artificial price for October 1979 live cattle futures," and that they "acted with the purpose or conscious object of causing or affecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand influencing futures prices in the particular market at the time of the alleged manipulative activity." To prevail on the false information theory, the plaintiffs were required to prove that the defendants delivered false or misleading or knowingly inaccurate reports regarding the live cattle or live cattle futures markets, which "affected the price of October 1979 live cattle futures."
 
 
 27
 Under either theory it was necessary for the plaintiffs to prove that Dittmer's and Refco's actions were intended to and did produce an artificially low price for the October 1979 live cattle futures contract, and that these actions were a proximate cause of their damages. The evidence before the jury was not sufficient to support the jury's special verdict that the defendants "manipulate[d] the market for October 1979 live cattle futures."
 
 
 28
 A. The plaintiffs' claim that Dittmer and Refco created an artificially low price in the October 1979 futures contract had two elements: (1) That Dittmer's recommendations to Refco's brokers and customers from April to October 1979--that they go long in the futures market because he believed that futures prices would increase--in fact was false and designed to increase artificially the price of October futures to enable him to unload his open futures contracts in that month at higher prices and that those recommendations had the effect of increasing the price for October futures contracts; and (2) that Dittmer's delivery of a large amount of cattle on October 2 and 3 artificially lowered the futures price and unduly depressed cattle prices, which continued to fall thereafter. The plaintiffs contend that Dittmer first unloaded his cattle at high prices and then depressed the price by going short on a substantial number of contracts, and that as a result, the plaintiffs received lower than normal prices when they subsequently sold their cattle.
 
 
 29
 To support this theory, the plaintiffs introduced the following evidence:
 
 
 30
 1. The testimony in the Horn case. The plaintiffs read into the record the testimony of several former Refco brokers, given in the Horn case, about statements made over the " 'Refco' hotline"--a telephone line connecting Refco's headquarters in Chicago with its regional offices--urging Refco brokers and customers to go long in the October and December 1979 live cattle futures contracts. The plaintiffs state that this testimony "established in detail the repeated exhortations on the Refco 'hotline'--by Dittmer and other Refco personnel--to get the firm's brokers and customers to 'go long in the cattle,' to 'load the boat,' and even to 'mortgage the farm.' " They assert that these statements "were not even [Dittmer's] true opinion but worse, were part of a concerted effort to make false and misleading statements to affect the market price of live cattle futures," and that the defendants, "creating an artificial demand for the contract through these extraordinary and unfounded efforts to jack up the futures market price, created an artificial price for the contract."
 
 
 31
 In support of the latter contention, the plaintiffs' point to the testimony of two witnesses, Ed Apel (a floor trader on the Exchange) and Roger Johnson (a former Refco broker). Apel testified that in a conversation with Dittmer on October 2, 1979 regarding the October 1979 live cattle futures market, Dittmer stated that he favored the long position and that "it was news to me because up until the point of that phone call, he had always told me to get the heck out of my long cattle position." Johnson referred to a conversation he had with Dittmer in September 1979, in which Dittmer was "very aggressive in making the statement that he was going to drive the cattle market low." Johnson stated that he "was a little bit surprised because up to that point Refco had been very, very friendly or bullish to the cattle market and it seemed as though he had done an about turn and become quite bearish."
 
 
 32
 2. Trading activity in October 1979 by Dittmer and his affiliated entities. In the first three days of October 1979, Dittmer and Refco accounted for a significant portion of the total deliveries of cattle made under short positions in the October 1979 live cattle futures contract. On October 1, they made 55 percent (92 out of 166 deliveries); on October 2, 24 percent (103 out of 425); and on October 3, 57 percent (342 out of 602). For the remainder of the month, they made only three percent of total deliveries (23 out of 862). The total market deliveries in the first three days of the month (1193) constituted 58 percent of the total deliveries (2,055) for the entire month.
 
 
 33
 In his personal speculative account, Dittmer liquidated 300 long October futures contracts by purchasing 300 short contracts on October 2, 1979. Dittmer and his affiliates also liquidated several short positions in the October contract. The defendants allege in their brief that "most of the short positions (90 in No. 192 and 150 in No. 214)" in Dittmer's two personal hedge accounts "were closed by buying the market on October 2." The defendants further claim that the hedge accounts of ABF/Financial Co. and Cactus Growers, Inc. (Dittmer's cattle feeding companies) "held other short October live cattle positions" which were "closed by buying the market on October 2, 1979." The plaintiffs do not challenge these figures.
 
 
 34
 3. The Expert Testimony. The plaintiffs also presented, and rely upon, the testimony of two economic experts who had not testified in the Horn case; Professor Helmuth and Dr. Beyer.
 
 
 35
 Professor Helmuth described the operation of the cattle cash and futures markets and described a study he had made for a congressional committee about cattle futures trading. He concluded in that study that once the price of futures contracts approached the cost of feeding the cattle, the prices would drop, and that "[e]vidence indicates that the predictable drops in live cattle futures prices are not reflective of fundamental supply/demand conditions and are, in fact, artificial price moves."
 
 
 36
 Dr. Beyer testified about trading in the October market. The plaintiffs retained Dr. Beyer to investigate two issues: (1) "whether or not the futures price for live cattle in October 1979 caused the cash price for live cattle in that same month to decline," and (2) if so, "the amount to which the decline in the cash price occurred because of the decline in the futures price."
 
 
 37
 Dr. Beyer testified that his investigation lead him to conclude (1) that "the review of information on the behavior of the futures market in October 1979, ... provided to me a--an indication that there was some unusual behavior occurring in the futures market in that month for live cattle futures"; (2) that "the statistical test that was performed resulted in a rigorous conclusion ... that there was a causal relationship reflected in the statistical test between the futures prices and--and the cash price"; and (3) that "the review of the supply and demand factors in and around October 1979 suggested on balance that the behavior of the cash price in 1979, October 1979 specifically, should have been relatively stable rather than declining as it actually did." Dr. Beyer's "fundamental" conclusion was that "there is a causal relationship between the futures price and its decline in October 1979 and decline in the cash price for live cattle in the same month."
 
 
 38
 Dr. Beyer did not examine or analyze Dittmer's trading activity in the October 1979 futures contract. In response to a hypothetical question based upon Dittmer's trading advice to Refco brokers and his trading activities on October 1 and 2 summarized above and "assum[ing] [his] actions became known to other major traders in the marketplace," Dr. Beyer stated that "a given trader could influence, could cause the price for the futures in live cattle to change."
 
 
 39
 The plaintiffs' theory is that they were injured because Dittmer's and Refco's trading activities depressed cattle prices after October 2, 1979, when the plaintiffs sold their cattle in the cash market. Dittmer's recommendations to Refco brokers that they go long in the futures market could not themselves have produced that result, since the effect of those purchases would have been to increase rather than to decrease the prices of the October futures contracts. The actions of Dittmer and Refco that allegedly were responsible for the decrease in cattle prices beginning in October 1979 must have been (1) their delivery of a large volume of cattle under short contract positions and (2) Dittmer's purchase of 300 short contracts on October 2.
 
 
 40
 There are no fixed standards or tests to apply in determining whether there has been "manipulation" of a commodities market. The Commodities Act does not define the term, and the "test of manipulation must largely be a practical one.... The aim must be therefore to discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand...." Cargill, Inc. v. Hardin, 452 F.2d 1154, 1162 (8th Cir.1971), cert. denied, 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972).
 
 
 41
 To establish manipulation that injured them, the plaintiffs were required to show that the post-October 2 prices in the October 1979 futures market were artificially low, i.e., lower than they would have been under the operation of normal supply and demand market forces, and that the decline in the futures price was a proximate cause of the decline in cash prices. The only theory upon which the earlier purchases by Refco brokers could have caused or contributed to that result would have been if the higher earlier prices on October futures caused a price drop beginning on October 2 that brought the futures price below what it would have been had there not been the prior purchases. As the plaintiffs stated at oral argument, the allegedly artificially-induced higher futures prices before October 1, produced a roller coaster downward effect on prices once they began to fall on October 2, and this brought prices below the level that otherwise would have prevailed.
 
 
 42
 There is no evidence in the record that would support a jury finding that Refco brokers' earlier purchases of the October futures contract would have had that effect, or that Dittmer knew they would do so. At most, the record would justify the conclusion that Dittmer's prior recommendations to go long increased the prices of the October contract and that the subsequent delivery of cattle and selling of October futures contracts on October 2 resulted in a decrease in prices.
 
 
 43
 Neither Johnson's testimony (given in the Horn case) that Dittmer told him in September 1979 that he (Dittmer) "was going to drive the cattle market low" or Dr. Beyer's opinion, given in response to a hypothetical question based on certain aspects of Dittmer's trading activities that may or may not have adequate record support, that such a trader "could influence" or "could cause the price for the futures in live cattle to change," are sufficient to bridge this causal gap. They do not establish that the trading activities of Dittmer and Refco had that effect.
 
 
 44
 Even if Dittmer and Refco had "the power and opportunity to do so," if they "did not in fact cause an artificial price [they] cannot be guilty of manipulation." Cargill, 452 F.2d at 1167. Here the plaintiffs have not shown either that Dittmer and Refco were responsible for the decline in cattle prices beginning in October 1979 or that October futures prices in that month were below the level that normal market forces would have produced. Dr. Beyer did not testify that prices were below that level. He stated only that there was "some unusual behavior occurring" in the cattle futures market in October 1979 and that that market was "unusual." This is a far cry from stating that prices in the market in that month were below the prices that normal market forces would have produced, and would not warrant the jury in so inferring.
 
 
 45
 Likewise, Dittmer's purchase of 300 short contracts on October 2 could not support a finding that it had any effect on the futures price. On October 2, 15,250 trades were made in the October contract. Dittmer's purchase of 300 short contracts was made to liquidate the long position in his speculative account, and represented less than two percent of the trading volume. Moreover, as noted above, Dittmer and his affiliates liquidated approximately the same number of short positions on that date. The effect of liquidating the short contracts presumably would be to support the October futures price, while the liquidation of the long contracts presumably would have the opposite effect on the price of that contract. The net effect of this trading activity on the October futures prices, if any, would have been insignificant.
 
 
 46
 B. The district court charged the jury that to recover on their false information claim, the plaintiff were required to show that the defendants knowingly delivered, or caused to be delivered, "false or misleading or knowingly inaccurate reports regarding the live cattle or live cattle futures market," and that these reports "affected the price of October 1979 live cattle futures." The plaintiffs assert that the Horn testimony made that showing.
 
 
 47
 Horn involved a claim under section 4b of the Commodities Act, 7 U.S.C. § 6b, that Dittmer had committed fraud in making certain statements. We reversed, holding that the evidence was insufficient to establish fraud.
 
 
 48
 One of the alleged fraudulent statements was that "Dittmer misrepresented to Apel on October 2, 1979 that he expected the price of October and December cattle futures contracts to rise and that he believed a long position in those contracts was correct." Horn, 776 F.2d at 780. We held:
 
 
 49
 Dittmer's statement amounts to nothing more than the expression of his opinion concerning the cattle futures market. An expression of opinion may constitute fraud only if the actor knew when stating the opinion that it was false.
 
 
 50
 There is nothing in the record of this case to indicate that Dittmer thought or knew that the statement was false when made.... In view of the volatile nature of commodities futures markets, Dittmer's opinion concerning the market could very easily have changed shortly thereafter. Moreover, commodity traders take positions in the market for a variety of reasons, and thus, at any given time, a trader's market position may not reflect his opinion concerning long-term market trends....
 
 
 51
 Horn, 776 F.2d at 780-81 (citation omitted).
 
 
 52
 The flaws we found in the plaintiff's proof of fraud in Horn are equally present in the Horn testimony upon which the plaintiffs rely in the present case to establish that Dittmer and Refco made "false or misleading or knowingly inaccurate reports" regarding the October 1979 live cattle futures market. Although the plaintiffs correctly point out that Horn involved a claim of fraud under section 4b of the Commodities Act and the present case involves a charge of manipulation under section 9(b) of that Act, that distinction is irrelevant in determining the sufficiency of the evidence to show the giving of false, misleading, or knowingly inaccurate reports concerning the cattle market. The evidence upon which the plaintiffs rely is insufficient to show that Dittmer's investment recommendations and other statements he made regarding the October futures cattle market were false, misleading or inaccurate, or that he knew or believed them to be so when he made them.
 
 
 53
 III. The RICO Count.
 
 
 54
 Count III of the complaint alleged that Dittmer and Refco violated RICO, 18 U.S.C. § 1962(c), by engaging in a "pattern of racketeering activity" through wire fraud, an "indictable" offense under 18 U.S.C. §§ 1341, 1343. According to the complaint, the defendants "used the mails and telephone" (1) to buy short positions in the October 1979 live cattle contracts under which large deliveries were later tendered at artificial prices; (2) to induce others, through fraudulent and deceptive statements and representations, to purchase large long positions in the October 1979 and December 1979 live cattle contracts; and (3) to communicate and conspire with their co-conspirators in furtherance of the alleged unlawful acts.
 
 
 55
 The evidence the plaintiffs relied on to support these charges was the same evidence they offered in support of their Commodities Exchange Act charge--evidence which, they assert, "established that Dittmer's public expressions of opinion--that the October 1979 live cattle futures market would go up--were not what he actually believed." We have held, however, that that evidence was insufficient to support their claims under the Commodities Act. The same deficiencies in that evidence that we have noted in part II of this opinion also undermine its sufficiency to support the jury verdict for the plaintiffs under their RICO count.
 
 
 56
 In Horn, the plaintiff made a RICO claim similar to that made here. In rejecting that claim, we stated:
 
 
 57
 Because we have concluded that Horn did not make a submissible case of fraud against Dittmer, we likewise hold that there was insufficient evidence to send the RICO count to the jury. Not having been shown to have committed any fraudulent act, Dittmer could not have violated section 1343. Thus Dittmer's motion for a directed verdict or judgment n.o.v. on Horn's RICO claim should have been granted.
 
 
 58
 Horn, 776 F.2d at 782.
 
 
 59
 That reasoning is equally applicable to the RICO claims in the present case. The evidence does not support the jury verdict that Dittmer and Refco violated RICO, and that verdict cannot stand.IV. The Antitrust Count.
 
 
 60
 Count II of the complaint alleged that the "plan and conspiracy of Dittmer and others acting in concert with him, to manipulate the live cattle futures market and to cause artificial cattle futures prices and cash prices ... constitutes an unlawful combination and conspiracy in restraint of trade in the marketing of cattle in violation of Section 1 of the Sherman Act." In its instructions, the only reference the court made to the product market in the case was the statement that there was no controversy that "trading in live cattle futures" involves interstate commerce.
 
 
 61
 At oral argument, the plaintiffs stated that the gravamen of their antitrust claim was a conspiracy by the defendants to reduce the prices in the October 1979 cash market in order to injure the plaintiffs, who, as small cattle producers, were Dittmer's competitors. The theory of the antitrust claim thus is strikingly similar to that of the Commodities Act claim: That Dittmer and Refco conspired and combined to depress prices in the 1979 cash market by depressing prices in the October 1979 futures market. Since the Sherman Act Count incorporated the allegations upon which the Commodities Act count was based, the Sherman Act count apparently also reflects the theory that the defendants first attempted to increase the October 1979 futures contract prices, and then depress them, thereby reducing the Fall 1979 cash market prices.
 
 
 62
 The present case, therefore, is unlike the typical price-fixing case under Section 1 of the Sherman Act, where a group of competitors are alleged to have entered into a conspiracy or combination to eliminate or restrict price competition among themselves, either to increase or to stabilize their own profits or to injure another competitor. Here the theory is that Dittmer entered into a conspiracy with Refco and/or various individuals and companies to reduce prices in the October 1979 live cattle futures market by first increasing prices before October in the futures market, with the intent thereby (1) to decrease prices in the October futures market and (2) to decrease prices in the cash market during the Fall of 1979. There is no basis in the record, however, upon which the jury properly could have concluded that Refco or any of the other named alleged co-conspirators entered into such a conspiracy with Dittmer.
 
 
 63
 To the extent that the plaintiffs rely on the Horn testimony that prior to October Dittmer was urging the Refco brokers to go long on October futures, the alleged conspiracy between Dittmer and the brokers would have been one to increase prices. Such a conspiracy would have helped rather than injured the plaintiffs, since they would have obtained higher rather than lower prices for any cattle they sold during the time of such agreement.
 
 
 64
 Moreover, there is no evidence that even suggests that, if the brokers had entered into such a conspiracy with Dittmer, their ultimate aim was to lower rather than to increase prices in the October futures market. Indeed, to the extent that the brokers and their customers went long in October futures, they did so in the hope that prices of those futures would go up, not down.
 
 
 65
 In addition to the Refco brokers, the complaint named as coconspirators Apel, a floor trader on the Exchange, who occasionally executed trades for Dittmer, and also traded cattle futures for his own account through Refco; Cox, a large cattle feeder from Texas, who traded cattle futures for his own account through Refco; Block, who worked for Dittmer in a "bookkeeping numbers capacity" and managed the trading activity in the hedge account of DIT Trust, a Dittmer family trust that financed the purchase of cattle; and ABF/Financial Co., Cactus Feeders, Inc., and Cactus Growers, Inc., which were Dittmer's cattle feeding companies. The evidence would not support a jury finding that any of these alleged coconspirators engaged in a conspiracy or combination with Dittmer to lower prices in the October 1979 cattle futures market.
 
 
 66
 The plaintiffs state that Apel, as a floor trader on the Exchange, "dealt closely with Dittmer" and handled his transactions. This is not evidence of a conspiracy between Dittmer and Apel to reduce cattle futures prices. This also is true of Horn's testimony that he believed Dittmer and Cox "were acting in concert" in early 1979 to take large deliveries of May 1979 feeder cattle and June 1979 live cattle, and that Strange and Bone (both former Refco brokers) had speculated that Dittmer and Cox were "partners in cattle feeding operations"; and Dittmer's testimony that he and Block "probably" discussed decisions over "whether to make a delivery" out of the DIT Trust hedge account. In cases alleging conspiracies to fix or affect prices, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case," and thus "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1985) (citing Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984)).
 
 
 67
 The plaintiffs point to no evidence of any conspiracy between Dittmer and ABF/Financial Co., Cactus Feeders, Inc., or Cactus Growers, Inc. This is not surprising, since those companies were Dittmer's own cattle feeding companies.
 
 
 68
 The plaintiffs also rely on evidence that the Exchange imposed sanctions on Dittmer, Refco, and Refco brokers McVean, Bone, Strange, and Woods in December 1979. The Exchange's disciplinary actions arose out of several investigations it made of "serious and repeated violations of recordkeeping functions, order entry procedures, margin requirements, and hedge procedures which, if brought to hearing, may have been deemed violations of various Chicago Mercantile Exchange Rules." The persons against whom such proceedings were instituted settled the proceedings by consent agreements in which they did not admit any of the Exchange's allegations. In addition to the fact that there was no determination in those proceedings that any of the respondents, in fact, had committed the violations charged, there is nothing that suggests, let alone demonstrates, that the alleged violations were the result of concerted rather than individual action.
 
 
 69
 In sum, the evidence simply does not support the jury's verdict that Dittmer and Refco engaged in a conspiracy or combination to lower the prices of the October 1979 futures contract, in violation of Section 1 of the Sherman Act. Much of the alleged conspiratorial conduct has not been shown to be anything more than normal legitimate trading activity, in which each market participant (e.g., commission merchants, customers, brokers, floor traders, etc.) acts independently and in its own best economic interests. "A jury cannot reasonably infer the existence of a conspiracy merely from the opportunity to form one." H.J., Inc. v. International Tel. & Tel. Corp., 867 F.2d 1531, 1545 (8th Cir.1989). As previously noted, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita, 475 U.S. at 588, 106 S.Ct. at 1356 (citation omitted).
 
 V.
 
 70
 In view of our conclusion that the evidence is insufficient to support the jury verdict in favor of the plaintiffs, the issues raised in the plaintiffs' cross-appeal--whether the district court improperly refused to certify the suit as a class action and to award prejudgment interest--are moot, and, therefore, we do not consider them.
 
 
 71
 The judgment of the district court is reversed.
 
 
 
 *
 DANIEL M. FRIEDMAN, of the Court of Appeals for the Federal Circuit, sitting by designation